CAMERON MUTUAL INSURANCE
CO., Respondent,

v.

Robert Newton WARD, J. N. Ward, Ronnie Ward, and Howard Dale Ellis, a minor, Howard Ray Ellis, and Mrs. Howard Ray Ellis, Appellants.

No. KCD 30472.

Missouri Court of Appeals,
Western District.

April 7, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 5, 1980.

Applications to Transfer Denied
June 10, 1980.

R. Max Humphreys, Miller, Humphreys & Seidel, Trenton, for appellants, Robert Newton Ward, J. N. Ward and Ronnie Ward.

Morris & Foust, Max W. Foust, Lloyd L. Messick and E. Wayne Taff, Kansas City, for appellants Ellis.

Mitchell, O'Laughlin, Fitzgerald & Kristl, P. C., George T. O'Laughlin and Michael D. Fitzgerald, Kansas City, for respondent.

Before SOMERVILLE, P. J., and PRITCHARD and MANFORD, JJ.

SOMERVILLE, Presiding Judge.

A declaratory judgment action was brought by Cameron Mutual Insurance Company (Cameron Mutual) to determine whether its policy of automobile liability insurance extended coverage to injuries sustained by a guest passenger after alighting from the insured vehicle as a result of the discharge of a .243 Magnum Winchester rifle lying in the insured vehicle. The other parties to the action, all of whom were joined as defendants, were Robert Newton Ward and J. N. Ward, the named insureds, Ronnie Ward who was using the insured vehicle (a 1973 Chevrolet ¾ ton pickup) with the express permission of the named insureds, Howard Dale Ellis, a minor, the injured guest passenger, and Howard Ray Ellis and Mrs. Howard Ray Ellis, the parents of the injured minor. It is appropriate to note that a separate action for damages was pending between the Ellises as plaintiffs and Ronnie Ward as defendant.

A bench trial culminated in a "Judgment Entry" on September 8, 1978, favorable to Cameron Mutual. The "Judgment Entry" contained "findings" and "conclusions" that (1) the "discharge of the rifle" and the "resulting" injuries sustained by Howard Dale Ellis "did not arise out of the operation, use or maintenance of the Chevrolet truck . . . within the meaning of the policy of insurance" issued by Cameron Mutual and that (2) Cameron Mutual "is not and should not be required under the terms and provisions of said policy of insurance to defend or indemnify . . . Ronnie Ward or J. N. Ward or Robert Newton Ward . . . in any claims or actions . . . brought for damages based upon such injuries to Howard Dale Ellis." The judgment portion of the "Judgment Entry" declared, adjudged and decreed that Cameron Mutual was not required under the terms of its policy to defend or indemnify the Wards in any action or pay any judgment for damages based upon bodily injuries sustained by Howard Dale Ellis as a result of the accidental discharge of the rifle.

All of the defendants timely appealed, and one common question is broached on appeal—did the trial court, under the law and facts, incorrectly exonerate Cameron Mutual from any duty to indemnify or defend under the terms of its policy? Under the insuring agreements contained in its policy, Cameron Mutual, among other things, agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . sustained by any person, caused by accident and arising out of the ownership, maintenance or use of the automobile." The language, "arising out of the . . . use of the automobile", has judicially plagued a number of cases involving the accidental discharge of weapons in or about motor vehicles. A combination of the legal construction given this language and its application to variant fact situations has given rise to a diversity of results in an ever growing body of case law. Although a pattern of consistency is discernible throughout the cases concerning the legal construction given to such language, a common problem is encountered in reconciling

its legal construction with the particular facts in a given case. In order to achieve a proper result in a given case this interplay between law and facts must be carefully balanced.

Although not a gun discharge case, *Schmidt v. Utilities Ins. Co.*, 353 Mo. 213, 182 S.W.2d 181 (1944), is widely cited in this and other jurisdictions for its discussion concerning the legal construction given such insuring agreements. *Schmidt*, premised upon the basic rule that insuring agreements which are susceptible of various interpretations are to be liberally construed in favor of the insured, holds that the "words 'arising out of * * * use' are very broad, general and comprehensive terms . . . [and the] words 'arising out of' . . . are ordinarily understood to mean 'originating from' or 'having its origin in,' 'growing out of' or 'flowing from' . . . .", and although it is not required that the "use" of the automobile be the "direct and proximate" cause of the injury in the strict legal sense of causation permeating general tort law, there must be some causal connection between an injury and the "use" of an automobile in order for there to be coverage. *Schmidt v. Utilities Ins. Co., supra*, 182 S.W.2d at 183–84. See also *Suburban Service Bus Co. v. National Mut. Casualty Co.*, 237 Mo.App. 1128, 183 S.W.2d 376 (1944).

The experience of assimilating divergent fact situations into the basic legal construction given such insuring agreements has produced an array of peripheral principles which are frequently relied upon for determining the existence or nonexistence of coverage under automobile liability insurance policies in vehicle—gun discharge cases. The parties on appeal have indiscriminately cited a number of cases reflecting these peripheral principles, with virtually no attention given to distinguishing them factually. At best, they are of nebulous value absent being conceptually categorized. An attempt to do so reveals that this court is writing on a clean slate insofar as Missouri case law is concerned.

Generally speaking, the cases cited by the parties from other jurisdictions, as well as those ferreted out by this court's independent research, fall into five principal categories. The category which each falls into is determined by its underlying facts. One category of cases may be fittingly described as involving the accidental discharge of guns inside moving or motionless vehicles while an occupant of the vehicle is handling or toying with the gun. The following typify cases which fall into this category: *Western Cas. and Sur. Co. v. Branon*, 463 F.Supp. 1208 (E.D.Ill.1979); *American Liberty Insurance Company v. Soules*, 288 Ala. 163, 258 So.2d 872 (1972); *Brenner v. Aetna Insurance Company*, 8 Ariz.App. 272, 445 P.2d 474 (1968); *Hartford Fire Ins. Co. v. State Farm Mut. Auto.*, 574 S.W.2d 265 (Ark.1978); *Azar v. Employers Casualty Company*, 178 Colo. 58, 495 P.2d 554 (1972); *Mason v. Celina Mutual Insurance Company*, 161 Colo. 442, 423 P.2d 24 (1967); *United States Fidelity & G. Co. v. Western Fire Ins. Co.*, 450 S.W.2d 491 (Ky.App.1970); *National Family Ins. Co. v. Boyer*, 269 N.W.2d 10 (Minn.1978); *National Union F. Ins. Co. of Pittsburg, Pa. v. Bruecks*, 179 Neb. 642, 139 N.W.2d 821 (1966); *Raines v. St. Paul Fire & Marine Insurance Company*, 9 N.C. App. 27, 175 S.E.2d 299 (1970); and *State Farm Mut. Auto Ins. Co. v. Centennial Ins. Co.*, 14 Wash.App. 541, 543 P.2d 645 (1975). Without exception, these cases hold that no coverage exists under the insuring agreements of the respective automobile liability policies involved because there was no causal connection between the discharge of the guns and the use of the vehicles; at best, the vehicles were merely the "situs" or "locus" of any resultant injuries as discharge of the guns was unconnected with the inherent use of the vehicles.

A second category of cases may be fittingly described as involving the accidental discharge of guns during the process of loading them into or unloading them from vehicles. The following typify cases which fall into this category: *Laviana v. Shelby Mutual Insurance Company*, 224 F.Supp. 563 (D.Vt.1963); *Allstate Insurance Company v. Valdez*, 190 F.Supp. 893 (E.D.Mich.

1961); *Viani v. Aetna Insurance Company*, 95 Idaho 22, 501 P.2d 706 (1972); *Travelers Insurance Co. v. Aetna Casualty & Sur. Co.*, 491 S.W.2d 363 (Tenn.1973); and *Allstate Insurance Co. v. Truck Insurance Exchange*, 63 Wis.2d 148, 216 N.W.2d 205 (1974). Without exception, these cases hold that coverage exists under the insuring agreements of the respective automobile liability policies involved by reason of coverage extended to the process of loading and unloading vehicles.

A third category of cases may be fittingly described as involving the use of a physical portion of a vehicle as a "gun rest" for the purpose of firing a weapon. The following typify cases which fall into this category: *Fidelity and Casualty Company of New York v. Lott*, 273 F.2d 500 (5th Cir. 1960); *National Farmers Union Property and Cas. Co. v. Gibbons*, 338 F.Supp. 430 (D.N.D. 1972); and *Norgaard v. Nodak Mutual Insurance Company*, 201 N.W.2d 871 (N.D. 1972). Although *Lott* held there was a causal connection between the use of a vehicle as a gun rest for a weapon and the resultant wounding of a passenger when the weapon was fired, and therefore coverage was afforded under the insuring agreement of an automobile liability policy, *Gibbobs* and *Norgaard* reached the opposite conclusion on the theory that use of a vehicle as a gun rest constituted a use foreign to the vehicle's inherent use.

A fourth category of cases may be fittingly described as involving the accidental discharge of guns resting in or being removed from gun racks permanently attached to vehicles. The following typify cases which fall into this category: *Reliance Ins. Co. v. Walker*, 33 N.C.App. 15, 234 S.E.2d 206 (1977), and *Transamerica Ins. v. United Pac. Ins.*, 20 Wash.App. 138, 579 P.2d 991 (1978), aff'd 92 Wash.2d 21, 593 P.2d 156 (1979). These cases appear to pivot on the rationale that the presence of permanently attached gun racks in vehicles establishes a significant causal connection between the use of such vehicles and the accidental discharge of weapons carried therein, hence affording coverage under the insuring agreements of automobile liability insurance policies for any resultant injuries occasioned by the accidental discharge of such weapons while in or being removed from such permanently attached gun racks.

A fifth and final category of cases may be fittingly described as involving the accidental discharge of guns inside a vehicle caused by the actual movement or operation of the vehicle. The following typify cases which fall into this category: *State Farm Mutual Automobile Ins. Co. v. Partridge*, 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123 (1973); and *Southeastern Fidelity Ins. Co. v. Stevens*, 142 Ga.App. 562, 236 S.E.2d 550 (Ga.App.1977). In *Partridge*, a pistol equipped with a "hair trigger" accidentally discharged and wounded a passenger when the vehicle hit a bump, and in *Stevens*, a pistol accidentally discharged and killed a passenger when the vehicle turned onto a bumpy, rutted and unpaved road. The respective courts in both cases found a causal connection between the accidental discharge of the pistols and the movement, i. e. use, of the vehicles, and that the resultant injuries arose out of the use of the vehicles within the meaning of the insuring agreements of the respective automobile liability policies.

Before turning to the salient facts of this particular case, it is appropriate to be reminded that appellate review of this bench tried case is decidedly limited and tightly circumscribed by the guidelines laid down in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976): "[In court tried cases] . . . the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law . . . [and] [a]ppellate courts should exercise the power to set aside a decree or judgment on the grounds that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong."

The declaratory judgment action in the instant case was submitted to the trial

court on the pleadings, an agreed statement of facts, and various depositions taken in the separately pending suit for damages brought by Howard Dale Ellis and his parents against Ronnie Ward for injuries resulting from the discharge of said rifle.

As culled from the various depositions taken in the separately pending damage suit, Howard Dale Ellis, a minor, on December 10, 1972, was riding in a 1973 Chevrolet ¾ ton pickup truck owned by Robert Newton Ward and J. N. Ward, insured by Cameron Mutual, and being driven by Ronnie Ward with the express permission of the named insureds. The driver and occupant of the pickup were engaged in hunting coyotes. After partially traversing a "bean field", the pickup came to a stop. Howard Dale Ellis got out of the pickup, and while standing on the ground outside the pickup a ".243 Magnum" rifle belonging to Ronnie Ward lying on the passenger's side of the pickup with the barrel facing the right door accidentally discharged and wounded Howard Dale Ellis in the left leg. There was no gun rack in the pickup. The rifle had been laid in the seat with a round in the chamber. Ronnie Ward had owned the rifle approximately one year. It was in good mechanical shape and was equipped with a "safety catch". No difficulty had ever been experienced with the "safety catch" and so far as known it was not defective. The rifle had not previously been fired that day or otherwise removed from the seat where it had been first placed. The "safety catch" was on when the rifle was placed in the seat. Neither Ronnie Ward nor Howard Dale Ellis handled the rifle in any manner after it was placed on the seat. The truck was traveling at a slow speed as it crossed the bean field. When the pickup truck stopped Howard Dale Ellis got out on the passenger's side, shut the door on the passenger's side and was standing on the ground with his hand on the door when the rifle discharged and the bullet pierced the door and struck him in the left leg. Howard Dale Ellis had closed the door in a "normal manner". When the rifle discharged Ronnie Ward was still sitting in the pickup. The door on the driver's side had not been opened. According to Ronnie Ward he was not touching the rifle in any manner when it discharged. Ronnie Ward did not know whether the door on the passenger's side of the pickup hit the barrel of the rifle when it was shut. The rifle was not examined after it accidentally discharged to determine whether the "safety catch" was on or off. By way of testimony that can only be characterized as speculatory, Ronnie Ward thought that the "motion" of the truck before it came to a stop may have caused the "safety catch" of the rifle to move from the on to the off position. According to Howard Dale Ellis he sat on the front part of the seat with the rifle lying behind him while he rode in the pickup and no part of his body ever touched the rifle. He never checked the rifle to see whether the "safety catch" was on or off. Howard Dale Ellis testified at one point that the rifle fired after he shut the door of the pickup and at another point that it fired "about the same time" he shut the door. When Howard Dale Ellis got out of the pickup he did not know whether the end of the rifle barrel was or was not touching the right door of the pickup.

So far as here pertinent, the following was contained in the "Agreed Statement of Facts": "That on the above date Howard Dale Ellis was outside of said pickup truck, after arriving at said property. Ronnie Ward was inside said pickup truck. A certain Winchester rifle was lying on the seat of said pickup truck. Said rifle accidently discharged, causing a bullet to strike and injure Howard Dale Ellis."

The Ellises, in their answer to Cameron Mutual's petition for declaratory judgment, as well as in their separately pending lawsuit against Ronnie Ward, affirmatively pleaded "that as . . . Howard Dale Ellis was alighting from said pickup truck, . . . Ronnie Ward carelessly and negligently caused his rifle to discharge and shoot a bullet into . . . [Howard Dale Ellis's] left leg . . . ." This affirmative allegation constitutes a judicial admission which is binding on the Ellises and precludes them from afterwards

maintaining a contrary or inconsistent position. *Wehrli v. Wabash Railroad Company*, 315 S.W.2d 765, 773–74 (Mo.1968); and *E. C. Robinson Lumber Co. v. Ladman*, 255 S.W.2d 72, 78 (Mo.App.1953). It is patent from the referenced affirmative allegation that the Ellises take the position that some overt act of Ronnie Ward after the pickup came to a stop caused the rifle to discharge. In short, human conduct wholly independent of the operation or use of the vehicle caused the rifle to discharge. According to their legal-factual theory, the pickup was merely the "situs" or "locus" of the accidental discharge of the rifle and, such being the case, there was no causal connection between the discharge of the rifle and the use of the automobile. Ergo, there was no coverage afforded by the insuring agreement of the automobile liability policy issued by Cameron Mutual under the overwhelming weight of relevant case authority from other jurisdictions which this court deems persuasive and judicially sound. *Western Cas. and Sur. Co. v. Branon, supra; American Liberty Insurance Company v. Soules, supra; Brenner v. Aetna Insurance Company, supra; Hartford Fire Ins. Co. v. State Farm Mut. Auto., supra; Azar v. Employers Casualty Company, supra; Mason v. Celina Insurance Company, supra; United States Fidelity & G. Co. v. Western Fire Ins. Co., supra; National Family Ins. Co. v. Boyer, supra; National Union F. Ins. Co. of Pittsburg, Pa. v. Bruecks, supra; Raines v. St. Paul Fire & Marine Insurance Company, supra;* and *State Farm Mut. Auto. Ins. Co. v. Centennial Ins. Co., supra.*

■ Wards' effort to fix coverage under a different legal-factual theory—that discharge of the rifle was associated with the movement or operation of the pickup truck—is likewise unsuccessful. Anything gleaned from the depositions suggesting that the motion or movement of the pickup before it came to a stop caused the "safety catch" on the rifle to move to the off position and the shutting of the door of the pickup truck caused the rifle to discharge is totally lacking in probative value because it necessarily rests on the tenuousness of speculation, conjecture and surmise. Regarding the nebulous nature of the evidence gleaned from the depositions, the trial judge, prior to entering judgment, as disclosed by the record, succinctly observed that "[t]he explanation of how the thing happened, there is really not one thing pointing to one particular way in which it happened."

■ The evidence which the trial judge had to draw upon in rendering judgment neither weighed in favor of a finding that a causal connection existed between the discharge of the rifle and the use of the pickup nor was it in a state of equipoise. Once it was stripped of speculation, conjecture and surmise it supported but one finding and conclusion—the pickup truck was merely the "situs" or "locus" of the unfortunate accident and no causal connection existed between the two so as to afford coverage under the insuring agreement of the policy of automobile liability insurance issued by Cameron Mutual. The trial court obviously concluded that the pickup truck was the mere "situs" or "locus" of the accident and that the discharge of the rifle and the resultant injury sustained by Howard Dale Ellis did not arise "out of the use" of the pickup truck. The legal soundness of this conclusion is buttressed by the plethora of cases falling into the first category heretofore mentioned. No legal prosthesis has been suggested to aid the evidential frailty of the Wards' legal-factual theory.

Although the opposing legal-factual theories advanced by the Wards and the Ellises may appear to have discombobulated resolution of this case on appeal, one thing is clear—it cannot be said that there was no substantial evidence to support the judgment of the trial court, or that it was against the weight of the evidence, or that it erroneously declared or applied the law, and therefore the same must be and is affirmed under the mandate of appellate review laid down in *Murphy v. Carron, supra.*

Judgment affirmed.

MANFORD, J., concurs.

PRITCHARD, J., dissents in separate opinion.

PRITCHARD, Judge, dissenting.

The principal opinion purports to hold, in part, that the Ellises made a binding judicial admission by pleading (in their underlying negligence action, and in this declaratory judgment) "that as . . . Howard Dale Ellis was alighting from said pickup truck, . . . Ronnie Ward carelessly and negligently caused his rifle to discharge and shoot a bullet into . . . [Howard Dale Ellis's] leg . . ." This holding ignores what the Ellises actually pleaded in the underlying case in the paragraph (3) following the above partial quote: "At all times mentioned herein, defendant was in complete management and control of the aforesaid rifle, that the occurrence described in Paragraph 2 was such as does not ordinarily happen if those in charge use ordinary care, that defendant possessed superior knowledge or means of information as to the cause of the occurrence, and that defendant was thereby negligent." The preceding allegation of paragraph 2 further set forth, "On or about December 10, 1972 plaintiff was a passenger in defendant's pickup truck being operated by defendant when plaintiff and defendant drove to a field in Daviess County, Missouri to hunt coyote." The allegation of paragraph 3 is one clearly of the doctrine of res ipsa loquitur. The principal opinion goes on, "It is patent from the referenced affirmative allegation that the Ellises take the position that some overt act of Ronnie Ward after the pickup came to a stop caused the rifle to discharge. In short, human conduct wholly independent of the operation or use of the vehicle caused the rifle to discharge. According to their legal-factual theory, the pickup was merely the 'situs' or 'locus' of the accidental discharge of the rifle and, such being the case, there was no causal connection between the discharge of the rifle and the use of the automobile. Ergo, there was no coverage afforded . . . "

Under the doctrine of res ipsa loquitur, all that plaintiff has to prove, precisely as here pleaded, to make a prima facie case of negligence thereunder, is that the occurrence resulting in injury was such as does not ordinarily happen if the one in charge uses due care, the instrumentality involved was under the management and control of the defendant, and defendant possesses superior knowledge or means of information as to the cause of the occurrence. *Furlong v. Stokes*, 427 S.W.2d 513, 517[2, 3] (Mo. 1968); and note the there cited leading case of *McCloskey v. Koplar*, 329 Mo. 527, 46 S.W.2d 557 (1932), where at page 563[6], the court said, "But in a res ipsa loquitur case, owing to the fact that such accidents ordinarily do not occur without negligence on the part of the defendant, and because the proof is more accessible to the defendant, the plaintiff need only show generally he was injured as a result of *some* negligence of the defendant, without pleading and proving what particular negligence." In the case of *Empiregas, Inc., of Noel v. Hoover Ball & Bearing Co.*, 507 S.W.2d 657, 661[8–10] (Mo.1974), the court said, "Plaintiff's petition is premised on the res ipsa loquitur doctrine. In general, the doctrine of res ipsa loquitur has no application to the pleadings, but is an inference aiding the proof * * *." See also the discussion of that rule in the there cited case of *Carter v. Skelly Oil Co.*, 363 Mo. 570, 252 S.W.2d 306, 309 (1952). Here, the Ellises pleaded no specific "overt" act of Ronnie Ward which would be a binding admission by them and which would preclude the application of the res ipsa loquitur doctrine to their underlying case. As more fully alluded to below, the pickup truck, as pleaded, was a part and parcel of the charge of res ipsa loquitur negligence, and it is no way pleaded that "the pickup was merely the 'situs' or 'locus' of the accidental discharge of the rifle," as held in the principal opinion. As alleged, both the pickup truck and the rifle were under the control and management of Ronnie Ward. Upon this pleading the principal opinion errs in holding that there was a binding admission of "some overt act of Ronnie Ward after the pickup came to a stop caused the rifle to discharge." As was observed in *McCloskey, supra*, 46 S.W.2d page 563[6], "in a res ipsa loquitur case, as in any other, the plaintiff starts out bearing both the burden of proof and the burden of

evidence. By showing for instance, that he was a passenger, the defendant a carrier, a train wreck, and consequent injury to him, he makes a prima facie case, since these facts raise an inference, or, as some authorities say, a presumption or 'prima facie presumption', that the accident was occasioned by the defendant's negligence *in some way*."

The principal opinion, although citing *Schmidt v. Utilities Ins. Co.*, 353 Mo. 213, 182 S.W.2d 181 (1944), ignores its language of construction of an almost identical insuring clause as here involved. * * * [A] policy must be liberally construed in favor of the insured so as not to defeat, without a plain necessity, his claim to indemnity, which in making the insurance it was his object to secure; and that, when words are susceptible of two interpretations, that which will sustain insured's claim must be adopted, since the language employed in the policy is that of the insurer." 182 S.W.2d 183[1, 2]. It was noted that the insurer made no attempt to limit the plain, usual and ordinary meaning of the terms used, and the holding was, under facts showing blocks were unloaded from the truck used, were placed on a public sidewalk and plaintiff tripped on and fell over the blocks, "[I]t may not be said as a matter of law that the negligent acts of the truck drivers (in disposing of the blocks after they had obtained and used them) were entirely disconnected from and disassociated with the ownership, maintenance or use of the trucks." 182 S.W.2d 184[4].

The principal opinion brushes off the import of, as it states, "A fifth and final category of cases may be fittingly described as involving the accidental discharge of guns inside a vehicle caused by the actual movement or operation of the vehicle." Of the cases cited in the principal opinion, two bear directly upon the issue, which is, did the alleged negligent act, of discharging a firearm to the injury of plaintiffs, arise out of the ownership, maintenance or use of the pickup truck? In *State Farm Mutual Automobile Ins. Co. v. Partridge*, 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123 (1973), the question presented in that declaratory judgment action was whether there was coverage under both a homeowner's insurance policy and an automobile liability policy, or was coverage limited to the automobile policy. The trial court held, and was affirmed on appeal that both policies applied, the homeowner's policy because the insured had filed a .357 magnum pistol to a hair trigger action, found to be a negligent distinct act; and the other negligent act under the automobile policy was that of driving the vehicle off the paved road onto rough terrain. The facts of the injury were that Partridge and Albertson were hunting jackrabbits from a four-wheel drive Bronco, with plaintiff Neilson sitting between them. Partridge spotted a jackrabbit crossing the road, and in order to keep it within his headlights he drove the vehicle off the paved road and onto the adjacent rough terrain where it hit a bump and the pistol discharged severely injuring Neilson. At the time the pistol discharged, Partridge was either holding it in his lap or resting it on top of the steering wheel pointed at Neilson. Although the court found that the "role played by the use of the car—constituting a substantial, and indeed, a proximate cause of the accident—was certainly sufficient to bring the present accident within the coverage of the automobile policy," (a conclusion not questioned by either party), it did comment about the coverage clause: "Past California cases have established beyond contention that this language of 'arising out of the use,' *when utilized in a coverage or insuring clause of an insurance policy*, has broad and comprehensive application, and affords coverage for injuries bearing almost *any* causal relation with the vehicle." 109 Cal.Rptr. 815, 514 P.2d 127[3, 4]. The *Partridge* case was of course not in res ipsa loquitur case such as this one. In the second case cited in the principal opinion, *Southeastern Fidelity Ins. Co. v. Stevens*, 142 Ga.App. 562, 236 S.E.2d 550 (1977), the action was to recover for medical and funeral expenses incurred with respect to bodily injury caused by an accident arising out of operation, maintenance or use of a motor vehicle within the terms of an

insuring agreement of a policy. The deceased was riding as a passenger in a truck driven along a smooth paved road. When about a mile from the driver's house, deceased took a pistol from the glove compartment and complained that it had jammed. The driver asked him to put it up, but did not notice what he did next. After she turned off the highway onto an unpaved bumpy road containing numerous potholes, and had proceeded a short distance toward the house, the gun went off and killed deceased. The court noted, page 551[1], "This [the 'use'] clause, a common one in motor vehicle insurance policies, has been subject to construction in other states, and it is usually interpreted in a broad sense for the usual reasons: that it is ambiguous, or should be construed in favor of the insured, or against the party drafting it, * * *." The court followed similar rules of construction as the *Schmidt* case, supra, and said further, "That almost any causal connection or relationship will do, see *Travelers Ins. Co. v. Aetna Cas. & Sur. Co.*, (Tenn.) 491 S.W.2d 363: * * *." And at footnote 8 of the *Partridge* opinion, supra, "Whenever circumstances reveal that the insured vehicle did bear some, albeit slight, causal connection with the shooting accident, courts have generally permitted recovery under automobile liability policies." In the there cited cases, *Dorsey v. Fidelity Union Casualty*, 52 S.W.2d 775 (Tex.Civ. App.1932), held, in allowing recovery, that the danger of being injured in the loading of guns into a car, which was used to carry the parties and their firearms on a duck hunting trip, "was necessarily incident to the use of the car for the purpose for which it was then being used, and the injury was one of the consequences of such use." *Viani v. Aetna Insurance Company*, 95 Idaho 22, 501 P.2d 706 (1976), involved unloading camping gear from a pickup, Viani tossing a bedroll belonging to Bowles from the truckbed onto a driveway, and a loaded pistol discharged when it hit the ground, wounding Viani. The court quoted with approval the *Dorsey* case, supra, on its issue of whether the injury resulted from the operation of the vehicle, and held that the

Allstate policy provided coverage to Viani for the gunshot accident "as the occurrence arose during the loading and unloading of the pickup." *Allstate Insurance Company v. Valdez*, 190 F.Supp. 893 (E.D.Mich.1961), involved a loading and unloading clause of a policy, which, as held, extends liability coverage beyond the limits of the words "maintenance and use", but held that coverage existed for one shot and killed by a co-hunter who in unloading his gun about 25 feet from the automobile when he slipped, fell and struck the butt of the gun on the ground. The court applied the "complete operation" doctrine—to regard the entire delivery or preparatory process as an integral part of the "loading" or "unloading" of the vehicle, and found that policy coverage existed. *Fidelity and Casualty Company of New York v. Lott*, 273 F.2d 500 (5th Cir. 1960), found coverage under an "ownership, maintenance or use" insuring agreement where insured was resting a rifle across the top of a parked automobile. The muzzle of the gun did not clear the curved top of the automobile and the bullet tore through it, was deflected downward, killing deceased who was seated in the right side front seat. As against the argument that the automobile was being "used" as a gun rest and not as a vehicle, the court said no such limitation was placed on the word "use" by the insurance company, and in answer to the insurer's contention that a contract of liability insurance "may not properly be construed to recover for injuries that result from acts 'wholly disassociated from, independent of and remote from the use' of the [vehicle]," the court, citing cases, said, "[T]he words 'incident to and arising out of the use of a motor vehicle' are not restricted to occasions when the insured party was hurt either because of the running of the automobile or because of its standing after normal use." See also *Suburban Service Bus Company v. National Mutual Casualty Company*, 237 Mo.App. 1128, 183 S.W.2d 376, 377–378 (Mo.App. 1944), following the *Schmidt* case, supra, "The policy, by its terms, does not require that the injury was directly and proximately caused by the use of the bus, or caused

by the bus itself, or that the injury occurred while the bus was in motion or operation. The policy insures against liability for injury arising out of the use of the bus. The words 'arising out of the use of the bus' are very broad, general, and comprehensive terms. The insurer made no attempt to limit the plain, usual, and ordinary meaning of the term 'use'. We find nothing in the policy requiring that the use of the bus shall be the direct and proximate cause of the injury. The words 'arising out of the use of the bus' are much broader than words such as 'directly and proximately caused by the use of the bus.' "

The facts here are that Howard Dale Ellis and Ronnie Ward were on a joint coyote hunting trip. The rifle, a dangerous instrument, was being transported in the pickup truck. Thus, the pickup truck was being *used* for that purpose, and the rifle was being carried on the seat pointed toward the right door of the vehicle. Upon the pickup truck coming to a stop, Howard Dale opened his door, alighted therefrom and closed the door. These were acts involving *use* of the pickup truck. At about this same time, the rifle discharged causing the injury. The injury and the use of the truck in carrying the rifle were clearly interrelated. It may not be said as a matter of law in this res ipsa loquitur case, whatever a jury might find as constituting negligence under that doctrine, that any such negligence was "entirely disconnected from and disassociated with the ownership, maintenance and use" of the pickup truck. The principal opinion entirely ignores the res ipsa loquitur pleading from which, if its elements are shown by the evidence, negligence could be found. The trial court in its observation, "[t]he explanation of how the thing happened, there is really not one thing pointing to one particular way in which it happened" which statement is quoted, apparently in approval in the principal opinion, patently misapplies the law under *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976), in that it is not required that plaintiff show specifically the cause of the discharge of the rifle. The principal opinion further ignores the plain pronouncements of the *Schmidt* and *Suburban Service Bus* cases, supra, as the rules of construction of insuring agreement clauses such as the one here in question. The judgment should be reversed and the case remanded with directions to enter a new judgment that liability insurance coverage exists for the underlying incident.

For the reasons stated herein, I respectfully dissent.